Good morning, Justices. My name is David Oliveiro. I represent employee Lenhart, the appellant on review. The issue before you is the nature and extent of injury. Previously, the arbitrator found that Mr. Lenhart was an odd lot, perm total. I'm not abandoning this position. However, I do recognize that some of the video is counterintuitive of what you might expect of an individual who is a perm total. The video shows him cutting grass, riding a motorcycle, things of that nature. And so, when you look at it critically, the respondent spent years and years of surveillance. It seemed to only show that he could do light household chores. These little video clips were short periods of time, and I believe that most of these videos are old and not related to his current condition of ill-being. I mean, didn't the Commission have some problems with the claimant's credibility? Not only on the issue of the physical limitations vis-à-vis the surveillance video, but they were troubled by the report of the IME psychologist, Ganellan, who, after administering a number of tests, didn't he indicate the claimant was exaggerating his limitations? In the decision, they did comment on that. The psychologist's role was to determine if the depression was related to his chronic pain, and there were these other issues that came up. The psychologist made no opinion as to his physical capabilities. There, obviously, that was, he wasn't a psychiatrist, he wasn't a psychiatrist, and he was not a psychiatrist.  And I think that's the reason why it's so important to ask the question, why don't we, you spend all your time on your weakest argument, why don't we get to your strongest argument, the wage differential? Well, thank you. I think when you look at the videotape, it actually supports my alternative position, which is it's a wage-differential case. Certainly, the videotape shows that he's not physically capable of performing a demanding job. Even in the Commission's decision, it mentions facts, findings of fact, which support a wage differential. He has difficulty climbing bleacher stairs, he walks with a limp, his son has to help him stand up. So I think if you look at the evidence that the Commission used to reduce the award, I think it supports the fact that it is a wage-differential case. And that is the preference on the case law, right? It is. Without abandoning the point that I previously made, there is support for the position that this is a wage-differential case. Even the Respondent's vocational rehabilitation counselors point out that Mr. Lenhardt cannot, without further retraining, maximize his income potential. That was in sworn testimony by the vocational rehabilitation people, who indicate that there's a job market between a range of $10 and $15 an hour for someone in his position. So I think from the posture of the case, it appears the Commission should have awarded him a wage-differential, rather than reduce his award down to 75 percent. And that's not a bad thing. I think that, as they say, a man is a whole. Did you make an election at the Commission level? Did Clayman make an election at the Commission level? No, we didn't. He was the winner. So obviously our position was that the arbitrator wisely chose to find him to be a firm total under the odd-lot theory. So there really was no point at that time to make an election. We can honestly say he's never weighed that. I mean, from a practical standpoint, can you really expect a petitioner who's seeking permanent total benefits to make an election for wage differential versus percentage awards? No. I mean, they're contradictory. I mean, are we going to force them to make alternative arguments and argue against themselves? Correct. I mean, if there is no request for permanent total, then I think the petitioner has to make an election. Do you want the wage differential, or do you want the percentage of the person in the poll? Correct. And that's going to depend on his age and how close he is to, I guess, what, 67 or something on that order? Correct. But when the whole theory of the petitioner's case is permanent total, how can anybody expect him to make an election? I don't understand that. You're right. It puts you in an awkward position and one that you sure don't want to advocate, especially if you believe there is some evidence that he is a firm total on an odd-lot basis. But obviously, when you look at all the evidence as it unfolds, there appears to be a better approach as far as the Court is concerned. His diminished earning capacity seems to bear out more than him being an odd-lot firm total. Very good. Thank you. Thank you, Counsel. Counsel, you may respond. Good morning, Justices. May it please the Court, I am John Campbell here on behalf of USF Holland. They are the appellee in this case. Good morning, Counsel. Addressing the first argument of my opponent in summary, I understand we spent more time on his secondary argument about revising the award to a wage differential. As for the firm total demand, I think the Court overruled it. I wouldn't have spent a lot of time on that. Okay. I understand. Get to the wage differential. That's the real issue. Understood. Okay. Two points on that. One, I think it's impossible to go back and accurately measure how much this individual can make. Let me ask you a question. Did you respond to his argument for wage differential in your brief? Well, I did in two ways. One, what I argued was we can't measure how much this individual can make in alternative earnings because of his misleading Your point, too, was arguing against VOC rehab, which is something he never asked for. Yeah. Why was that? Well, the logical, what had happened in the trial, we started the trial and the judge said, I think this guy is capable of work. We stop the trial and we'll VOC him. I was reluctant to do that because we had offered VOC in 2008 and the gentleman refused and inconsistently said I want my job back at USF Holland. See, I'm asking why in your brief before this Court you responded to an issue that was never raised but didn't respond to the issue that was raised. The reason I addressed it in the context of VOC is I don't think he has an accurate measure of how to award wage differential with any particular number. My fear was that the Court would do what the arbitrator did in the beginning, which was say remand this and now go VOC this guy again. And then we would find the wage differential measure, meaning does he make $15 an hour, $20 an hour, minimum wage, or wherever it may be. That was my fear because it happened at the arbitration level. We started this trial many years ago and it was stopped for that reason. I was frustrated by it, but we did it. And that's what led to a relatively long period of time of vocational, I'll say efforts by my vocational attorney. Can I ask a question, just as an old trial lawyer? If a petitioner is going after permanent total and in order to defeat the permanent total, you've got to bring in expert witnesses like you did, Mr. Stephan, and you've got to get them to testify, wait a minute, this guy isn't an odd lot. He's capable of working, right? Right. Why in heaven's name do you let him testify as to how much he could earn? Because you just walked yourself into a wage differential by doing it. Let me answer that, actually. Would you like me to read you Mr. Stephan's testimony? I know where you're going to cite it. You don't have to. I'm fully aware that both Duane Bigelow and Mr. Stephan said the average you're able to earn is $10 to $15 an hour. I know that. He also said in two parts, both Mr. Bigelow and Mr. Stephan, that the highest of the which would eliminate a wage differential. You know what he says here? Stable, vacant market, a position in which he could earn $10 to $15 an hour. You gave him the evidence that he never put in. And I don't understand why respondents do this. They do it constantly. Well, let me answer that in two ways. One, it was in Mr. Stephan's report and I needed him to testify with regard to the undermining of the vocational process to begin with. So I don't know that I had a choice. It was in his report. So I couldn't exclude it. He was going to testify to his report. He probably could have instructed him before he wrote it. Well, go ahead. Okay. But, you know, I digress. I know these are important. Take a fifth. You're being recorded. But my problem with this is a simple problem. Once there's evidence in the record that this guy can't do his old job anymore, and I guess finding him 75 percent disabled as a man of old pretty much tells you that, and there's evidence in the record that he can't perform at that level of work, and we know what he's making, and then we get expert testimony in the record, regardless of where it comes from, that he's capable of getting a job, access to readily available jobs in a stable labor market for a position where he could earn $10 to $15 an hour. Under Galeanetti, we've got a real problem on our hands here. I don't think you do. And, again, there's two reasons. One, they cite a high income earning capacity of 3,365 twice. Mr. Bigelow does at page 3117. Mr. Stephan does. I think I have 3123. They're both from the same agency. But they cite the high end of the income earning scale. So you're not beholden to $10 to $15 an hour. I know that Stephan testified to that at one part, but he also testified to a higher income earning capacity as well. My other argument, I want to make this before I finish. We don't know how much he can make because he continually misled everybody, not just doctors and therapists, but Mr. Stephan with regard to his capabilities. It was after all the vocational efforts, after we put him through computer training, because he alleged he didn't have any, that I found out he's operating Ken's Computers, which is run by his family. He actually tried to allege it was his wife's company, which is hilarious because his name is Ken Lenhard. So aside from the chuckle you get from that, I found it embarrassing that he would suggest it's his wife's company. But he had to admit he replaced hardware and software and computers at the town that he was working as a trustee, the whole time claiming he's totally disabled. And we spent time putting him in introductory computer courses. It's infuriating, and I think it's insulting that counsel would stand up and say, he can only make $15 an hour. We don't know how much he can make. We don't know what he can make. He has computer science skills. And if he would have. When you're talking about entitlement to a wage differential, our cases suggest, number one, the man doesn't have to look for work. He doesn't have to cooperate with vocational rehabilitation. He doesn't have to look for work. He doesn't have to have work. The only question is, is there evidence in the record that as to what he could earn in some, capable of earning in some suitable profession. So now the question becomes, what does the record say about that? And, by the way, Stefan was pretty honest about all this. And he turned around and said, you know, there's a limit here that maybe he could go to of $30 some. A person could be capable of working at $30 some an hour. But I don't want to be misleading. $15 to $30 an hour is not, it was not his opinion. I think he said that would be the most likely range. I understand. He didn't exclude the higher end of the range. But I absolutely agree. So the most likely range would be in that $10 to $15 range. So if a person is not required to work, and he's not required to have a labor study of any kind, what does the fact that he doesn't cooperate with the voc rehab people have to do with his entitlement to wage differential? My answer, in citing the GE case that my opponent cites, I circled the one phrase I thought was most apt to maintain the PPD award in this. Scheduled awards are often not fair. And so we turn to wage differential now in summarizing, but they use the term not fair, and we go to wage differential to offer a little bit more of an equitable award for people who have lost income or incapacity. If we're talking about fairness, this guy is the heavyweight champion of deception, and I think if you read the commission decision, they say it about five times. He deceived his doctors. He was misleading. He deceived psychological therapists, and he deceived Ed Stephan by hiding computer skills. My argument is we can't measure how much he can earn because he didn't even tell Ed Stephan the truth. All Ed could testify to was what he was told by Mr. Lenhardt in terms of his skills. We didn't know he had computer skills. Actually, before the trial, when I uncovered this, the judge said what, again, I'm afraid this Court may do, is say, well, he's got computer skills, great, now go get him a job. And I said, I'm done. I'm done with what he may be able to do. What else is he hiding? I don't want to know anymore. He's played games enough. We paid a quarter of a million dollars in TTD to this gentleman, a quarter of a million during this process. Arguably could have been cut off years earlier if he had cooperated in 2008. I think that should be part of the measure of fairness as cited in the GE case. Also, 75 percent of a man is one of the highest PPD awards I've ever seen, and this is my area of concentration. So I think the Commission was saying to themselves, we can't quite measure this perfectly because of this guy's level of deception. So what is fair? Seventy-five percent of a man is over $200,000. That's fair. We don't know what the Commission was thinking about wage differential because they never mentioned it. I understand they didn't. But I think in their verbiage, very harsh verbiage, about as harsh as a ruling body will get to call out somebody in terms of their behavior that they perceive, they rule accordingly in terms of fairness. And that's the spirit of the GE case. Did you not ask the Commission to award a wage differential? I think my request at trial was for 60 of a man. And then I think I, in alternative, said either a high PPD award or at minimum, this guy's employable at some level, but not, he's not totally disabled. But you really did tell them the wage differential was acceptable to the Respondent. On some level, using your qualified knowledge. I can't say. It's not. The guy's got permanent restrictions, even according to my own doctor. So I can't come up here to this Court today and say that the guy can do backflips. But what I can say is even if he can't drive a truck the way he used to, can this Court honestly say we know what he's capable of doing based on him hiding the fact that he has computer skills? I think that's a very big deal. You go to a vote counselor and you say you don't have computer skills and you go through the charade of going through an introduction to computer course, that alone should be enough to demonstrate that the individual is hiding what his true skills may be. He worked as a trustee. I don't want to get into the litany of things in my surveillance. I know the Court is well aware of it. But the culmination of all that, I think, equates to a conclusion by the Commission that was very fair. They have discretion to do that. They don't have to award a wage differential. But I don't know of a case that says you must, especially when 75 percent of a man is a pretty good measure equating to a wage differential that maybe the guy could make $20 on. Well, you can see it at Gallinetti. The case is expressive preference for a wage differential. I understand that. But I also believe that it is in the spirit of fairness. And, boy, if we want to be fair in this case and equitable, I think the quarter of a million paid to him in TTD while he engaged in his tomfoolery for five or six years plus $200,000, which is about, I think it's over $200,000, 75 percent of a man. It's fair. And it's reasonable. And we don't know how much he can actually earn if he was honest to a vocational counselor. So I ask that you not disturb that PPD award. Thank you. Thank you, Mr. Campbell. Thank you. Counsel, you may reply. Just briefly, Justices, both the vocational experts that Respondent hired indicated that the range was $10 to $15. If you look in Mr. Campbell's brief on page 16, he comments that Mr. Bigelow, who worked for Mr. Stephan, puts the likely range of petitioners' alternative earnings between $10 to $15 an hour. So I think this projection of $33 based on a limited phone market survey is not accurate. I think there's actually testimony on the subject, isn't there? There was. If I'm not mistaken, he testified something to the effect that he didn't want to mislead anybody by suggesting that he was opining that this guy could earn between $15 and $33 an hour. Let me find it. I think it was Stephan that testified to it. He didn't want to say that the claimant would be employable between $15 and $36 an hour because that could be, quote, somewhat misleading. The only opinion he actually gave was that he could earn between $10 and $15. I think that was Stephan's testimony. That's my understanding as well. Thank you. Thank you, counsel, both for your arguments. No matter. Good morning. You will be taken under advisement. A written disposition shall issue. The court will stand in recess until 9 a.m. tomorrow morning.